# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | § |
| | § |
| **Plaintiff,** | § |
| | § |
| **v.** | § |
| | § |
| **MARLIN MEDICAL SOLUTIONS,** | § |
| **LLC, SHAPA INC. d/b/a RITE** | § |
| **CARE PHARMACY, VC PHARMACY** | § |
| **d/b/a RITE CARE PHARMACY IV,** | § |
| **MEDSCRIPT PHARMACY, LLC** | § |
| **DAVID MARLIN EDWARDS,** | § |
| **RICHARD NIEMEYER, M.D.,** | § |
| **ALEX DE JESUS, M.D. and** | § |
| **LATISHA ROWE, M.D.** | § |
| | § |
| **Defendants.** | § |

## COMPLAINT

The United States of America ("United States" or "Government") brings this action to recover damages resulting from false claims submitted to the TRICARE program or caused to be submitted to the TRICARE program by the defendants Marlin Medical Solutions, LLC ("Marlin Medical"), Shapa Inc. d/b/a Rite Care Pharmacy, and VC Pharmacy d/b/a Rite Care Pharmacy IV (together, "Rite Care"), Medscript Pharmacy LLC ("Medscript"), David Marlin Edwards ("Edwards") and Drs. Richard Niemeyer ("Dr. Niemeyer"), Alex De Jesus ("Dr. De Jesus"), and Latisha Rowe ("Dr. Rowe"). Collectively, these individuals and entities are referred to herein as "the Defendants."

Beginning in or about November 2014, Marlin Medical, owned and operated by Edwards, entered into various compensation agreements with Rite Care, Dr. Niemeyer, and Dr. De Jesus that included payments for signing prescriptions for compounded drug products for TRICARE

beneficiaries ultimately sent to Rite Care for preparation and billing in violation of federal law. By knowingly conspiring to submit, and knowingly submitting, claims to a federal health care program seeking reimbursement for compounded drug prescriptions written by physicians who signed such prescriptions in exchange for payment, and who issued such prescriptions irrespective of the TRICARE beneficiaries' medical needs, the Defendants violated the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq* and the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b. Further, Dr. De Jesus' conduct and participation in the scheme resulted in separate violations of the Controlled Substances Act, ("CSA") as amended, 21 U.S.C. § 801 *et seq*.

## NATURE OF ACTION

1.     The United States brings this action against the Defendants to recover treble damages and civil penalties under the FCA. The United States further brings this action against Dr. De Jesus to recover civil penalties under the CSA.

2.     Defendants knowingly submitted or caused to be submitted false claims to the United States for reimbursement which resulted in millions of dollars of reimbursement that would not have been paid but for the Defendants' misconduct.

3.     Dr. De Jesus further violated the CSA by issuing prescriptions for controlled substances that were not medically necessary and outside the scope of normal medical practice. Dr. De Jesus signed blank controlled substance prescriptions in violation of federal law.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345, and 1367(a).

5.     This Court may exercise personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because the Defendants committed acts within this District or directly benefited from those acts that violated 31 U.S.C. § 3729.

6.     Venue is proper in the Western District of Texas under 31 U.S.C. § 3732 and 28 U.S.C. § 1391(b).

## PARTIES

7.     The United States brings this action on behalf of the Department of Defense and the Defense Health Agency, which administers the TRICARE program, 10 U.S.C. § 1071, *et seq;* ("TRICARE") *see also id.*, at §§ 1079, 1086, 32 CFR § 199.17.  The United States further brings this action on behalf of the U.S. Drug Enforcement Agency, which regulates the growth, manufacture, and distribution of controlled substances and individuals and entities involved in such activities. 21 U.S.C. §§ 801–971; 21 C.F.R. §1300 *et seq.*

8.     Defendant Marlin Medical Solutions LLC, located at 2419 Worthington Street, Dallas, Texas, 75204, is a limited liability company solely owned and operated by Defendant David Marlin Edwards.  Through Defendant Marlin Medical, Defendant Edwards currently markets several medical devices, ancillary services, access to laboratory services and pharmaceuticals, and disposable medical products and equipment, and sells new and used capital medical equipment.

9.     Defendant Shapa, Inc. d/b/a Rite Care Pharmacy, is a community/retail pharmacy owned and operated by Syed Zulfiqar and presently located at 9415 Bruton Road, Suite 3103, Dallas, Texas 75217.  At all times relevant to this complaint, it was located at 7560 Greenville Avenue, Dallas, Texas 75231.

10.     Defendant VC Pharmacy, d/b/a Rite Care Pharmacy IV, is a community/retail pharmacy owned and operated by Syed Zulfiqar and presently located at 3005 E. Renner Road, Suite 120, Richardson, Texas 75082.  At all times relevant to this complaint, it was located at 3453 Saint Francis Avenue, Dallas, Texas 75228.

11.     Defendant Medscript Pharmacy LLC is a community/retail and compounding pharmacy owned by Maryam Alrazzaq with a physical address at 14400 John Humphrey Drive, Suite 110, Orland Park, Illinois 60462.

12.     Defendant Dr. Richard Niemeyer is a medical doctor formerly practicing medicine at 146 E. Main Street, Leola, Pennsylvania 17540.  Dr. Niemeyer previously held a Pennsylvania medical license which expired on December 31, 2018.  Dr. Niemeyer resides in Lancaster, Pennsylvania.  He is also the principal officer of Youth Outreach International, a 501c3 charitable organization supporting hospitals and medical clinics in the United States and in foreign countries including Benin, Congo, Haiti, Indonesia, Ghana, Moldova, Malawi, Sudan, and Rwanda.

13.     Defendant Dr. Alex De Jesus is a medical doctor board certified in Internal Medicine/Rheumatology who holds a Texas medical license and a National Provider Identification Number.  Dr. De Jesus operates Dr. Alex De Jesus Rheumatology P.A. at 7959 Fredericksburg Road, Suite 135, San Antonio, Texas 78229.  Dr. De Jesus further holds a DEA registration, under which he is authorized to prescribe Schedule II, Schedule III, Schedule IV, and Schedule V controlled substances.

14.     Defendant Dr. Latisha Rowe is a medical doctor board certified in Family Medicine.  Dr. Rowe holds a Texas medical license and a National Provider Identification Number. Dr. Rowe is the founder and CEO of The Rowe Network, a Multispecialty Telemedicine Network with a physical practice address located at 1917 Ashland Street, Houston, Texas 77008.  At all

times relevant to this complaint, Dr. Rowe was the registered agent and officer of Rowe Alliance

LLC, a Texas limited liability company located at 2000 Crawford Street, Suite 800, Houston,

Texas 77002.

## THE FALSE CLAIMS ACT

15.   The FCA provides for the award of treble damages and civil penalties for, *inter*

*alia*, knowingly causing the submission of false or fraudulent claims for payment to the United

States government.  31 U.S.C. § 3729(a)(1).

16.   The FCA provides, in pertinent part, that a person who:

(a)(1)(A) knowingly presents, or causes to be presented, a false or
fraudulent claim for payment or approval;

(a)(1)(B) knowingly makes, uses, or causes to be made or used, a false
record or statement material to a false or fraudulent claim;

(a)(1)(C) conspires to commit a violation of subparagraph (A), (B), (D), (E),
(F), or (G);

…

[or]

(a)(1)(G) knowingly makes, uses, or causes to be made or used, a false
record or statement material to an obligation to pay or transmit money or
property to the Government, or knowingly conceals or knowingly and
improperly avoids or decreases an obligation to pay or transmit money or
property to the Government,

is liable to the United States Government for a civil penalty of not less than
$5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties
Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-
410), plus 3 times the amount of damages which the Government sustains.
. . .

31 U.S.C. § 3729.[1]

---

[1]      The FCA was amended pursuant to the Fraud Enforcement and Recovery Act of 2009
("FERA"), Pub. L. 111-21 (May 20, 2009).  Following the passage of the Bipartisan Budget Act

The FCA defines the terms "knowing" and "knowingly" to include (1) having actual knowledge of that information is false; (2) acting in deliberate ignorance of the truth or falsity of the information; or (3) acting in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b).  The statute does not require proof of specific intent to defraud. *Id.*

## TRICARE PROGRAM

17.     TRICARE includes the various federally funded programs overseen by the Secretary of Defense that provide health care and dental care benefits to members and former members of the uniformed services and their dependents.  10 U.S.C. § 1072(7).  In particular, TRICARE provides medical benefits, including prescription drug benefits, to (a) the spouses and unmarried children of (1) active duty and retired service members, and (2) reservists who were ordered to active duty for thirty days or longer; (b) the unmarried spouses and children of deceased service members; and (c) retirees.  10 U.S.C §§ 1071, 1072(2), (7).

18.     TRICARE operates as an enhancement to the Civilian Health and Medical Program of the Uniformed Service ("CHAMPUS").  32 C.F.R. § 199.17(a)(1)-(2).  The term CHAMPUS still appears in the Code of Federal Regulations provisions applicable to TRICARE.

19.     TRICARE's Pharmacy Benefits Program provides pharmaceutical products and services to all TRICARE beneficiaries as part of the Military Health System.  *See* 10 U.S.C. § 1074g, 32 C.F.R. § 199.21(a).  TRICARE beneficiaries can obtain outpatient pharmacy points of service under the retail network pharmacy benefits program, including at both retail and non-retail

---

of 2015, which substantially revised the prior provisions of the Federal Civil Monetary Penalties Inflation Adjustment Act of 1990, current penalties for violations of the False Claims Act are adjusted for inflation.  FCA penalties assessed after June 19, 2020 range from a minimum of $11,665 to a maximum of $23,331 per violation. 28 C.F.R. § 85.

network pharmacies. 32 C.F.R § 199.21(h)(1)(ii-iii), *see also* TRICARE Operations Manual 6010.59-M Ch. 23 Sec. 1.

20.     TRICARE pays for "medically or psychologically necessary services and supplies required in the diagnosis and treatment of illness or injury…"  This includes prescription drugs. 32 C.F.R. § 199.4(a)(1)(i).

21.     All fraud, abuse, and conflict of interest requirements for the basic program as outlined in 32 C.F.R. § 199.9 are applicable to the TRICARE pharmacy benefits program.  32 C.F.R. § 199.21(p).

22.     32 C.F.R. § 199.2 defines "fraud" as

a deception or misrepresentation by a provider, beneficiary, sponsor, or any person acting on behalf of a provider, sponsor, or beneficiary with the knowledge (or who had reason to know or should have known) that the deception or misrepresentation could result in some unauthorized CHAMPUS benefit to self or some other person, or some unauthorized CHAMPUS payment, or (2) a claim that is false or fictitious, or includes or is supported by any written statement which asserts a material fact which is false or fictitious, or includes or is supported by any written statement that (a) omits a material fact and (b) is false or fictitious as a result of such omission and (c) is a statement in which the person making, presenting, or submitting such statement has a duty to include such material fact.  It is presumed that, if a deception or misrepresentation is established and a CHAMPUS claim is filed, the persona responsible for the claim had the requisite knowledge.  This presumption is rebuttable only by substantial evidence.  It is further presumed that the provider of the services is responsible for the actions of all individuals who file a claim on behalf of the provider; this presumption may only be rebutted by clear and convincing evidence.

23.     TRICARE requires that providers seeking payment from the Federal Government through programs such as CHAMPUS have a duty to familiarize themselves with, and comply with, the program requirements. 32 C.F.R. § 199.9(a)(4).

24.     The TRICARE regulations list examples of certain conduct presumed to be fraudulent, including: (i) the submission of CHAMPUS claims or billings for supplies or equipment which are clearly unsuitable for the patient's needs or are so lacking in quality or

sufficiency for the purpose as to be virtually worthless and (ii) arrangements by providers with employees, independent contractors, suppliers, or others which appear to be designed primarily to overcharge the CHAMPUS through various means (such as commissions, fee-splitting, and kickbacks) used to divert or conceal improper or unnecessary costs or profits.  32 C.F.R. § 199.9(c)(4), (12).  Under the regulations, "the term 'abuse' generally describes incidents and practices which may directly or indirectly cause financial loss to the Government under CHAMPUS or to CHAMPUS beneficiaries." 32 C.F.R. § 199.9(b).  This regulation expressly states CHAMPUS is most vulnerable to abuse via claims involving overutilization of medical and health care services.  To avoid situations of abuse

> Providers have certain obligations to provide services and supplies under CHAMPUS which are: Furnished at the appropriate level and only when and to the extent medically necessary as determined under the provisions of this part; of a quality that meets professionally recognized standards of health care; and, supported by adequate medical documentation as may reasonably be required under this part by the Director, OCHAMPUS, or a designee, to evidence the medical necessity and quality of services furnished, as well as the appropriateness of the level of care.

32 C.F.R. § 199.9(b).  Examples of abuse or possible abuse situations under CHAMPUS include a "pattern of claims for services which are not medically necessary or, if medically necessary, not to the extent rendered."  32 C.F.R. § 199.9(b)(3).

## THE ANTI-KICKBACK STATUTE

25.     The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), arose out of Congressional concern that payoffs to those who can influence health care decisions would result in the provision of medically unnecessary and/or low-quality health care goods and services.     To protect the integrity of federal health care programs from these difficult-to-detect harms, Congress enacted a *per se* prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback gave rise to overutilization or poor quality of care.     The statute was first

enacted in 1972, and was strengthened in 1977 and 1987, to ensure that kickbacks masquerading as legitimate transactions did not evade its reach.  *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b), (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142 (Jan. 4, 1977); Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93 (Aug. 18, 1987).

26.      The Anti-Kickback Statute prohibits any person or entity from making or accepting payment, in cash or in kind, to induce or reward any person for referring, recommending or arranging for federally funded medical services, including services provided under the TRICARE Program.  In pertinent part, the statute provides:

> Illegal remunerations . . .
>
>> a.  whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person--
>>
>>> i.  to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>>>
>>> ii.  to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
>>
>>> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b.

27.      Under the Anti-Kickback Statute, "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of subchapter III of chapter 37 of title 31 [the False Claims Act]."  42 U.S.C. § 1320a-7b(g).  Otherwise stated,

any claim for payment submitted to a federal health care program in violation of the Anti-Kickback Statute constitutes the submission of a false or fraudulent claim for purposes of the FCA.

## DEFENDANTS' SCHEME

<u>Marlin Medical and Agreements with Pharmacies</u>

28.    Prior to October 2014, Edwards, in his capacity as sole proprietor of Marlin Medical LLC, entered into financial agreements with Defendant pharmacies Medscript and Rite Care. Pursuant to these arrangements, the pharmacies ostensibly paid Edwards to "market" the pharmacies to physician providers.

<u>Edwards is introduced to Dr. Niemeyer and J.G.</u>

29.    Prior to October 2014, J.L., a sports agent, met Edwards.  Edwards expressed to J.L. a desire to meet physicians for potential business opportunities.  J.L. introduced Edwards to Dr. Niemeyer.

30.    J.L. also introduced Edwards to J.G., a football agent residing in San Antonio, Texas.

<u>Marlin Medical LLC's Agreement with Dr. Niemeyer</u>

31.    In or about October 2014, Edwards contacted Dr. Niemeyer seeking his participation in signing compounded prescriptions regardless of medical necessity.  In exchange, Edwards paid Dr. Niemeyer via his charity, Youth Outreach International.

32.    On December 10, 2014, Edwards issued two checks drawn on Marlin Medical's registered Bank of America Account #7726.  Edwards is the sole signatory on the account.  The first check, #1081, was for $2,500.00; the second, check #1086, was written for $5,000.00.  Both checks were written to pay to the order of Youth Outreach International.

<u>The First "Test Study"</u>

33.     In October 2014, S.E. and K.B., two Air Force retirees and TRICARE beneficiaries residing in San Antonio and Oakland, Texas, attended a "test study" at the home of S.E.'s acquaintance, J.G..  Organized by Edwards, the "test study" event involved a presentation by Dr. Niemeyer concerning the efficacy of compound medications in alleviating pain associated with military-related injuries.

34.     At this event, S.E. provided her TRICARE beneficiary information and met with Dr. Niemeyer, who questioned S.E. regarding her symptoms and wrote her prescriptions for pain and eczema creams.  S.E. was paid $250 upon completing her meeting with Dr. Niemeyer. Following her interaction with Dr. Niemeyer, S.E. communicated with David Edwards, who informed her the test study seminars he was conducting were approved by TRICARE.

35.     K.B. similarly provided his TRICARE beneficiary information, met with Dr. Niemeyer, and recognized he was invited because he was a TRICARE beneficiary.

Recruiting the Marketers

36.     Edwards approached S.E. and K.B. following the event at J.G.'s home to gauge their interest in hosting similar events in the future and being paid to recruit attendees.  Edwards ultimately recruited S.E., K.B, and J.G. to market future "test study" seminars to other TRICARE beneficiaries in the area, with a goal of ensuring TRICARE beneficiary attendance at the events.

37.     S.E., K.B., and J.G. subsequently formed JKS Research LLC in early 2015 for the sole purpose of facilitating the business relationship with Edwards and Marlin Medical through recruiting TRICARE beneficiaries to attend the "seminars."

38.     S.E. subsequently approached T.C., an active duty Air Force Technical Sergeant assigned to Lackland Air Force Base, in late 2014.  S.E. explicitly referred to Marlin Medical and

the tests being conducted for pain, scar, and skin-smoothing creams.  S.E. invited T.C. to attend a meeting with her and Edwards.

39.     T.C. attended the meeting with S.E. and Edwards.  Seven to eight other people also attended, as did a physician who talked about the creams and their efficacy.  Marlin Medical was described as the host of the meeting, and the purpose of the meeting was to recruit personnel to participate in beta testing for these "breakthrough" creams.  Edwards informed T.C. the studies were TRICARE approved and "TRICARE always takes care of the military, and the service members will always be covered."

40.     T.C. was compensated $200 for his agreement to participate in the beta testing and he agreed to recruit additional attendees for other seminars.  Despite the lack of a formal written agreement, T.C. was told he would receive compensation based on the number of TRICARE beneficiaries he recruited to attend the seminars.  T.C. was a pastor at a San Antonio church.  His position allowed him ample opportunity to recruit TRICARE beneficiaries in the congregation to attend the seminars.

The December 2014 Seminar

41.     As part of their agreement with Edwards, S.E., K.B., and J.G. set up a test study seminar in December 2014 at the Omni Colonnade Hotel located at 9821 Colonnade Boulevard, San Antonio, Texas 78230 ("the Omni Seminar").  Prior to the event, Edwards paid J.G. $28,000 to use as payment to the beneficiaries participating in the Omni Seminar.  The Omni Seminar was hosted by Marlin Medical.

42.     Upon arrival, the TRICARE beneficiaries were gathered in a large meeting room and given beneficiary information cards or slips to fill out.  Sign in sheets were also provided.  The beneficiaries then saw a presentation by Edwards, who introduced himself and the physician.  The

physician spoke to the benefits of the creams, and a short film was played.  Attendees then saw Dr. Niemeyer individually.   Just as he had done for S.E. and K.B., Dr. Niemeyer filled out a compound prescription request form for each beneficiary reflecting which pain or scar creams, or "general wellness" products were prescribed.  Upon exiting the meeting with Dr. Niemeyer, the beneficiaries provided their beneficiary information cards to S.E, K.B., or J.G.  Each TRICARE beneficiary participant then received up to $250 upon completion of their meeting with Dr. Niemeyer.

43.     Approximately 100 people attended the event, including members of T.C.'s and S.E.'s church.  T.C. was compensated approximately $500 for his recruitment efforts for the Omni Seminar.

44.     At the end of the event, Edwards collected and kept each TRICARE beneficiary's information card.  S.E. asked for and obtained copies of these cards, as the amount of her payments from Edwards/Marlin Medical were determined, in part, by how many prescriptions were issued for the beneficiary attendees, which, in turn, determined the level of reimbursement each pharmacy received from TRICARE and, in turn, the amount of the payments each pharmacy paid Edwards.

<u>Marlin Medical's Agreement with Dr. Rowe</u>

45.     Prior to February 2015, J.L. introduced Edwards to Dr. Rowe.  In or about February 2015, Edwards contacted Dr. Rowe seeking her participation in signing compounded prescriptions regardless of medical necessity.

46.     On February 7, 2015, Edwards issued check #1116 from Marlin Medicals' registered Bank of America Account #7726 to Dr. Rowe in the amount of $1,500.00.  Edwards subsequently issued check #1123 from the same account for $25,000.00 to Dr. Rowe's business entity, Rowe Alliance, on February 24, 2015.

The February 2015 Seminar with Dr. Rowe

47.     As part of their agreement with Edwards, S.E., K.B., and J.G. set up a second seminar on or around February 7, 2015 at the DoubleTree Hilton Hotel located at 37 NE Loop 410 at McCullough, San Antonio, Texas 78216 (the "First DoubleTree Seminar").   The First DoubleTree Seminar was hosted by Marlin Medical, with Dr. Rowe identified as the physician present.   Edwards was also in attendance.

48.     As with the Omni Seminar the TRICARE beneficiaries attending the First DoubleTree Seminar gathered in a large meeting room at the hotel.   The beneficiaries filled out patient information slips or cards labeled "Marlin Medical Solutions."   Following a presentation from Dr. Rowe, the TRICARE beneficiaries were able to enjoy refreshments before seeing Dr. Rowe individually.

49.     For this event, J.G. fronted the money used to pay the TRICARE beneficiaries. Edwards subsequently reimbursed J.G. for these payments.

Marlin Medical's Agreement with Dr. De Jesus

50.     In or about February 2015, Edwards contacted Dr. De Jesus seeking his participation in signing prescriptions for medically unnecessary compounded prescriptions.

51.     On or about February 21, 2015, Edwards, on behalf of Marlin Medical, prepared a Consulting Agreement with Dr. De Jesus.   A copy of the Consulting Agreement was found in Dr. De Jesus' possession, along with both blank and completed pre-printed compound prescription forms and related documents.[2]   A copy of the blank compound prescription form appears in Exhibit 6.

---

[2] As detailed in paragraphs 102-104, *infra*, FBI agents executed a search warrant at Dr. De Jesus' facility on November 15, 2016.

52.     An attachment to the Consulting Agreement (labeled "Exhibit A") outlined the

services Dr. De Jesus was expected to perform and the terms of payment.  Specifically, Exhibit A

to the Consulting Agreement provided as follows:

> Company [Marlin Medical] shall pay Medical Practice [Dr. De Jesus] the sum of
> ($2,500.00) for each training/speaking opportunity while serving as a clinical
> advisor to Marlin Medical Solutions LLC.  This entails that physician make himself
> or herself available to teach local physicians on benefits of practice management,
> therapeutic advancements, clinical observations as well as clinical training to sales
> force of Marlin Medical Solutions.

53.     Under the heading "Compensation," the Consulting Agreement further stated that

the "Consulting Fees" outlined in Exhibit A were to be paid at the end of each month following a

month during which Dr. De Jesus provided such "Services."

54.     At item 2.03, the Consulting Agreement states

> Payment of the Consulting Fees are acknowledged as the parties' negotiated
> agreement as to the reasonable fair market value of the Services furnished by
> Medical Practice pursuant to this Agreement considering the nature and volume of
> the services required and the responsibilities assumed by Medical Practice
> hereunder.

(the "Reasonable Value Clause").

55.     At item 2.04, the Consulting Agreement further provides

> The parties agree that no provision of this Agreement shall be construed to induce
> or encourage the referral of patients or the purchase of healthcare services or
> supplies.  The parties acknowledge that there is no requirement under this
> Agreement or any other agreement, between Medical Practice and Company or any
> third party that Medical Practice refer any patient, or influence the referral of any
> patient, to Company for the provision of any healthcare services or supplies.  No
> payment under this Agreement in return for the referral of patients to either party
> or in return for purchasing or ordering of healthcare services or supplies from the
> other party.

(the "Referrals Clause").

56.     On February 23, 2015, Edwards paid Dr. De Jesus $2,500.00 via check #1121 drawn on Bank of America account #7726 registered to Marlin Medical Solutions.  As described below, Dr. De Jesus performed services that did not match what was outlined in Exhibit A to the Consulting Agreement.   Rather than teach local physicians about the benefits of practice management, therapeutic advancements, and clinical observations at speaking engagements or provide clinical training to Marlin Medical's sales force,, Dr. De Jesus spoke only briefly about compounded drug products to TRICARE beneficiaries before issuing them prescriptions for such products regardless of medical necessity.

The February 2015 Seminar with Dr. De Jesus

57.     On February 17, 2015, Edwards made reservations under Marlin Medical for an event on February 21, 2015 at the DoubleTree Hilton Hotel located at 37 NE Loop 410 at McCullough, San Antonio, Texas 78216 (the "Second DoubleTree Seminar").   The Second DoubleTree Seminar was hosted by Marlin Medical, with Dr. De Jesus identified as the physician present.

58.     As with the two prior seminars, the TRICARE beneficiaries attending the Second DoubleTree Seminar gathered in a large meeting room at the hotel.  The beneficiaries filled out patient information slips or cards labeled "Marlin Medical Solutions."  Edwards introduced Dr. De Jesus.  Dr. De Jesus spoke on the use and supposed benefits of the creams.  The beneficiaries then saw Dr. De Jesus one at a time in a separate room and were paid up to $250 upon completion of the meeting with Dr. De Jesus.

59.     Dr. De Jesus retained copies of the completed patient information cards from this event. On each of the cards was a space to enter information concerning what the patient was prescribed.  These cards contain a space to note the individual patients' complaint or condition(s).

The cards in Dr. De Jesus' possession contained notes for conditions including "Diet," "Scar," "Diet/Migraine," "Pain/Scar," "Pain," "Gen Well," "Excema" or a combination thereof.

60.     Dr. De Jesus also retained notes referencing "Rite Care Pharmacy" and 67 "scripts" or prescriptions.   Two phone numbers associated with Rite Care Pharmacy and Rite Care Pharmacy IV were also listed.   855-414-7484 was the fax number associated with Rite Care Pharmacy IV at its former address at 3453 Saint Francis Avenue, Dallas, Texas 75228.   214-421-2210 is the phone number associated with both Rite Care Pharmacy and Rite Care Pharmacy IV.

61.     As a result of his recruitment for the Second DoubleTree Seminar, T.C. was paid $1,000.

Beneficiary Experiences

62.     TRICARE beneficiary F.M. attended two of the seminars after hearing Mr. Calvin announcing at a church function that the seminar was offering "free money" for participating in a medical study.   On the day of the first study, F.M and the other attendees were told they would receive $250 each at the end of the test study.   F.M. provided her name and basic contact information, but not her TRICARE benefits information.   While waiting to see the physician, F.M. noticed S.E., an acquaintance from her former church.   F.M approached S.E., who subsequently escorted F.M. to the front of the line to meet with the doctor.   F.M. advised the doctor she had pain in her knees and back, and he responded he would prescribe some pain cream.   F.M. did not undergo a physical exam or x-ray and did not complete a medical history questionnaire.   F.M. found it odd that the doctor did not write down any information concerning her medical complaints. F.M then went to another room where S.E. sat handing out yellow envelopes. Upon receiving her envelope, F.M. found it contained $250 in cash.   F.M. subsequently received a prescription through

the mail for a compound cream containing ketamine.  The prescription for the compound cream listed Medimix Pharmacy as the pharmacy and Dr. Niemeyer as the prescribing physician.

63.    The second seminar F.M. attended was conducted in the same way as first seminar, albeit with a different doctor at a different hotel.  F.M. thought the second seminar would serve more as a follow up visit for the purpose of determining the effectiveness of the cream Dr. Niemeyer had prescribed.  Instead, the physician at the second seminar asked F.M. the same questions as Dr. Niemeyer had asked about her knee and back pain.  No physical examination was conducted, nor was there any inquiry into the efficacy of the prescribed product.  At the end of the second seminar, F.M. received another envelope with $250 in cash.  F.M.'s daughter, TRICARE beneficiary B.M., accompanied F.M. to the second seminar, and also received $250 in cash.  B.M. subsequently received a prescription for some pills to help her with headaches.  The prescription was issued by Dr. De Jesus.

64.    Dr. De Jesus retained copies of the compounded prescriptions he issued.  The prescription for TRICARE beneficiary F.M. had products for "Dietary Wellness" and "Migraine/Tension" marked.  The Dietary Wellness product was further marked for five refills, while the Migraine/Tension product had two refills.  The prescription is dated February 21, 2015, and bears Dr. De Jesus' NPI number, DEA registration number, and handwritten signature.

65.    The prescription for TRICARE beneficiary B.M. found in Dr. De Jesus' possession has products for "Dietary Wellness" and "Migraine/Tension" marked.  There are three refills indicated for "Dietary Wellness" and two for "Migraine/Tension."  The prescription is dated February 21, 2015 and bears Dr. De Jesus' NPI number, DEA registration number, and handwritten signature.

66.     TRICARE beneficiary A.M. attended two of the seminars with MF.M. after hearing Mr. Calvin announcing at a church function that the seminar was offering "free money" for being involved in some kind of medical testing. A.M. approached S.E. with F.M. and was escorted to the front of the line simultaneously.  A.M. met with the doctor at the same time as F.M. and did not indicate any specific medical complaint. A.M. did not complete a medical history questionnaire and did not receive a physical exam or x-ray.  A.M. accompanied F.M. to the second room where S.E. was handing out the yellow envelopes, and also received an envelope containing $250 in cash. A.M. attended the second seminar with both F.M. and B.M.  She met the physician there as well. At the end of the second seminar, A.M. received another envelope with $250 in cash.

67.     The prescription for TRICARE beneficiary A.M. found in Dr. De Jesus' possession had products for "Dietary Wellness" and "Most Common #1" in the "Musculoskeletal Pain Inflammation" product category marked.  The Most Common #1 product had two refills.  The prescription is dated February 21, 2015, and bears Dr. De Jesus' NPI number, DEA registration number, and handwritten signature.

68.     TRICARE beneficiary D.R. attended the Second DoubleTree Seminar with her husband and received compensation of approximately $100 to $200 for full attendance of the seminar, which lasted two hours.  D.R. was questioned by Dr. De Jesus regarding her medical history and informed him she had stretch marks she would like to reduce.  D.R. spent approximately five minutes with Dr. De Jesus at the Second DoubleTree Seminar no physical exam was conducted.  D.R. later received a generic prescription bottle via mail.  She did not use the cream it contained, as the packaging and lack of instructions did not seem right to her.

69.     The prescription for TRICARE beneficiary D.R. found in Dr. De Jesus' possession had the "Over 3 inches (OBGYN) 240gm" product in the "Most Common Scar Cream" category

marked.  The prescription is dated February 21, 2015, and bears Dr. De Jesus' NPI number, DEA registration number, and handwritten signature.

70.     TRICARE beneficiary S.D. attended the Second DoubleTree Seminar believing it and the creams to be part of a TRICARE approved testing program or case study for new medications.  S.D. was compensated approximately $50.00 for his attendance at the Second DoubleTree Seminar.  S.D. did not receive a physical or medical examination at the seminar; he did speak with someone concerning his medical history, including pain, scars, and numbness in the arms and legs.  S.D. later received pain medications in a manila folder via the mail, which he found to be ineffective.  S.D. did not receive any follow up regarding his use of or reaction to the creams but did continue to receive refills of the creams despite not requesting them.

71.     The prescription for TRICARE Beneficiary S.D. found in Dr. De Jesus' possession had the "General Wellness" product marked, as well as "Most Common #1" in the "Musculoskeletal Pain Inflammation" category; the "Over 3 inches (OBGYN) 240gm" product in the "Most Common Scar Cream" category; and the "Migraine/Tension" product.  All products except the General Wellness product were noted as having 2 refills.  The prescription is dated February 21, 2015, and bears Dr. De Jesus' NPI number, DEA registration number, and handwritten signature.

72.     TRICARE beneficiary C.R. attended the Second DoubleTree Seminar with his wife.  C.R. noticed Marlin Medical was involved in the seminar, and that it targeted TRICARE beneficiaries.  C.R. spoke with Dr. De Jesus in his wife's presence concerning shoulder pain; no medical or physical examination was conducted.  The entire conversation with Dr. De Jesus lasted approximately five minutes.  C.R. did not agree to receive the creams and did not believe he

received any medications.  C.R. believed his refusal to receive the creams resulted in his not being paid by the seminar.

73.     The prescription for TRICARE beneficiary C.R. found in Dr. De Jesus' possession had the "Most Common #1" product in the "Musculoskeletal Pain Inflammation" category marked, as well as the "Over 3 inches (OBGYN) 240gm" product in the "Most Common Scar Cream" category.  The prescription is dated February 21, 2015, and bears Dr. De Jesus' NPI number, DEA registration number, and handwritten signature.

74.     TRICARE beneficiary A.C. attended the Second DoubleTree Seminar, understanding it to concern compounding creams and diet pills.  A.C. received between $200 and $250 for her participation in the study.  A.C. observed approximately 100 people in the conference room, with nowhere private for a doctor to conduct any kind of physical exam or speak privately with a patient.  A.C. had concerns at the time as to whether Dr. De Jesus could possibly examine all of the TRICARE beneficiaries in the amount of time allotted for DoubleTree Seminar 2.  A.C. did not receive a medical examination from Dr. De Jesus.  Instead, as with other beneficiaries, he briefly questioned her concerning any medical conditions.  A.C. subsequently received pain creams and diet medications via mail.  She did not find the creams or diet medications effective and did not receive any kind of follow up regarding whether or not the products worked.

75.     The prescription for TRICARE beneficiary A.C. found in Dr. De Jesus' possession had the "Dietary Wellness" product marked with three refills, and the "Migraine/Tension" product marked with three refills.  The prescription is dated February 21, 2015, and bears Dr. De Jesus' NPI number, DEA registration number, and handwritten signature.

76.     TRICARE beneficiary T.C. attended the Omni and DoubleTree Seminars.  During the seminars, Edwards would introduce himself and the products, then introduce the physician.

The physician would discuss research on the creams and the benefits.  A short film was played, and the attendees could enjoy refreshments while they waited to meet with either the physician or one of two other women assisting the physician.  Participants met with the physician (or an assistant) for approximately five to ten minutes, discussed any medical issues, ensured they had the necessary information on the data slip, and later received compound medications through the mail.  No medical examination was conducted, and participants whose insurance was accepted received approximately $200.  The physician did not fill out the prescription slips and provide them to attendees at the Omni or DoubleTree Seminars; rather, the attendees filled out the data slips and provided them to the physician (or an assistant).  T.C. assumed the prescriptions were filled out after the fact and sent to the pharmacy, believing Marlin Medical itself was a pharmacy or that the company coordinated with an affiliated pharmacy to fill prescriptions.  T.C. himself never received any follow up regarding the efficacy of the creams, which he did find odd for a test study.

77.     The prescription for T.C. found in Dr. De Jesus' possession had the "Dietary Wellness" product marked with three refills, and the "Migraine/Tension" product marked with zero refills.  The prescription is dated February 21, 2015, and bears Dr. De Jesus' NPI number, DEA registration number, and handwritten signature.

The Prescriptions

78.     Dr. Niemeyer, Dr. Rowe, and Dr. De Jesus utilized pre-printed compound prescription request forms to authorize various compounded substances for TRICARE beneficiaries, and issued such prescriptions without performing any medical examination to determine the appropriateness of the prescriptions.  These prescription forms further contained pre-printed directions for the quantity and frequency of any oral products to be taken by mouth, as

well as instructions for the quantity and frequency of any topical products to be applied to affected skin.  There are no spaces on the prescription forms for a physician to provide different instructions tailored to the medical needs of the individual patient.

79.     Between November 19, 2014 and January 28, 2015, Dr. Niemeyer prepared prescription request forms resulting in the issuance of 227 prescriptions for one or more compounded drug products to 105 TRICARE beneficiaries then residing in the Western District of Texas.  These prescriptions were sent to Medscript for fulfillment. 180 of these prescriptions contained authorization for one or more refills.  362 refills were ultimately fulfilled and had associated claims submitted to TRICARE.  As a result, there are a total of 589 prescriptions, including all refills issued by Dr. Niemeyer, filled by Medscript, and reimbursed by TRICARE. 206 of the refills (and thus submission for claim for reimbursement), occurred between February 25, 2015 and May 6, 2015.  TRICARE reversed payments on 44 of all medically unnecessary prescriptions issued by Dr. Niemeyer.  14 of those reversed payments were for refills occurring between February 25, 2015 and May 6, 2015.

80.     On February 21, 2015, Dr. De Jesus prepared prescription request forms resulting in the issuance of 185 prescriptions for compounded drug products to 59 TRICARE beneficiaries then residing in the Western District of Texas.  All these compounded prescriptions were sent to Rite Care for fulfillment and billing.  Rite Care began doing so on February 24, 2015.  42 had refills that were fulfilled and billed by April 29, 2015.  Of these 227 prescriptions, the amount paid by TRICARE was ultimately reversed for 20 of them.

81.     On March 4, 2015, Dr. Rowe issued prepared prescription request forms resulting in the issuance of 40 prescriptions for compounded drug products to 20 TRICARE beneficiaries then residing in the Western District of Texas, including one for S.E.  All of these compounded

prescriptions were sent to Rite Care for fulfillment and billed as bulk chemicals.  29 refills were also fulfilled with claims submitted to TRICARE.

Medscript's Payments to Marlin Medical

82.     Following receipt of the prescriptions from Dr. Niemeyer, Medscript compounded the prescriptions and refills and mailed them to TRICARE beneficiaries between October 2014 and May 2015.  Total reimbursement received by Medscript from TRICARE between November 2014 and August 2015 for the compounded prescriptions totaled $4,224,000.00. Between February 25, 2015 and May 6, 2015, 213 refills on compound drug prescriptions issued by Dr. Niemeyer were prepared and billed to the TRICARE Program.  TRICARE paid Medscript a total of $1,068,492.74 for these compounded prescriptions between February 25, 2015 and May 6, 2015.

83.     On December 8, 2014, Medscript paid Marlin Medical $191,700.00 via check #1320.  Edwards, as sole proprietor of Marlin Medical deposited this check to Bank of America Account #7726.  On January 16, 2015, Medscript paid Marlin Medical $905,387.32 via check #1369.  The memo on this check stated "Nov. 1-Jan. 15."  Edwards deposited this check on January 20, 2015 to the same account.  On April 10, 2015, Medscript paid Edwards $60,574.84 via check #10342.  Edwards deposited this check on April 15, 2015.  In total, Medscript paid Edwards, d/b/a Marlin Medical, $1,157,662.16.

Rite Care's Payments to Marlin Medical

84.     Following receipt of the prescriptions from Dr. De Jesus, Rite Care compounded the prescriptions and mailed them to the TRICARE beneficiaries.  Between February 24, 2015 and April 30, 2015, 227 compound drug prescriptions issued by Dr. De Jesus were prepared and billed to TRICARE.  Payments on 20 of these compound drug prescriptions were ultimately reversed by

TRICARE. Despite the reversals, TRICARE paid Rite Care a total of $1,041,665.06 for 207 compounded prescriptions.

85.     Following receipt of the prescriptions from Dr. Rowe, Rite Care compounded the prescriptions and mailed them to the TRICARE beneficiaries. Between March 25, 2015 and May 1, 2015, 69 compound drug prescriptions issued by Dr. Rowe were prepared and billed to TRICARE. TRICARE paid Rite Care a total of $503,619.66 for 69 claims for compounded prescriptions.

Marlin Medical's Payments to Recruiters

86.     The scheme was highly profitable for Edwards and Marlin Medical. In turn, he ensured S.E., K.B., and J.G. were compensated as well. Edwards paid a total of $230,180.50 into the JKS Research LLC Security Service Federal Credit Union Account #6071. S.E., K.B., and J.G. were all signatories on the account. 10 deposits, totaling $155,535.50, came from Bank of America Account #7726 for "David M. Edwards Sole Proprietor DBA Marlin Medical Solutions." On February 7, 2015, Edwards issued check #1115 to JKS Research LLC for $3,000.00. The memo of this check stated "Marketing" and was deposited on February 17, 2015. On February 21, 2015, Edwards issued check #1120 to JKS Research LLC for $5,000.00. The check was deposited on February 24, 2015. On March 3, 2015, Edwards performed a wire transfer to the account in the amount of $3,000.00; two subsequent wire transfers for $9,000.00 each were made on March 19 and 20, 2015. On March 25, 2015, Edwards made a wire transfer in the amount of $9,000.00, with "Employee Compensation" in the memo associated with the transfer. "Employee Compensation" appeared in the memo for Edwards' subsequent transfers to the JKS Research LLC account on April 1, 2015 ($2,522.00); April 3, 2015 ($43,363.50); and April 10, 2015 ($8,150.00). On May 5, 2015, Edwards made the last transfer from Bank of America Account #7726 to JKS Research

LLC in the amount of $63,500.00.  The memo for this transfer indicated the payment was for "Employee Compensation Re: Commission."

87.     The remaining $74,645.00 in payments to JKS Research LLC came from Bank of America Account #8939 for "Marlin Medical Solutions LLC David Edwards, Manager" via three wire transfers with "employee compensation" noted in the memo for the transfer.  On May 21, 2015, Edwards wired the JKS Research LLC account $3,000.00.  On May 29, 2015, Edwards transferred $38,645.00; the remaining $33,000.00 was transferred on August 28, 2015.  Edwards was the sole signatory on both Bank of America accounts to make these payments.

88.     Further, 10 payments totaling $336,863.50 were made between December 22, 2014 and May 6, 2015 from Marlin Medical's Bank of America Account #7726 to Pioneer Bank S.S.B. Account #6070.  That account is owned by Griff3 Enterprises LLC.  J.G. is listed on the account as the manager and sole signatory.  On December 15, 2014, Edwards issued check #1085 to J.G. in the amount of $2,500.00.  The check was deposited on March 4, 2015.  December 20, 2014, Edwards issued check #1087 to J.G. in the amount of $28,750.00.  In the memo of the check, Edwards noted it was for "Dec. Pay."  The check was deposited on December 22, 2014.  On January 13, 2015, Edwards transferred $30,500.00 to Griff3 Enterprises LLC via wire and noted in the memo "Attn [J.G.]."  This same note appears in the memo for additional wire transfers on January 29, 2015 ($142,250.00); February 19, 2015 ($1,000.00); and March 19, 2015 ($9,000.00). Four additional wire transfers were made by Edwards to Griff3 enterprises, with "Employee Compensation Attn [J.G.]" noted in the transfer memo.  These transfers were made on March 25, 2015 ($9,000.00); April 1, 2015 ($7,000.00); April 3, 2015 ($43,363.50); and May 6, 2015 ($63,500.00).

89.     Edwards made two additional payments to Griff3 Enterprises via Marlin Medical's second Bank of America Account #8939.   These payments, made via wire transfer, noted "Employee Compensation" in the transfer memo.   On May 14, 2015, Edwards transferred $8,000.00.  He transferred an additional $31,785.00 on June 11, 2015.

90.     In total, Edwards paid J.G. and Griff3 Enterprises a total of $376,648.50.

91.     On February 6, 2015, J.G. transferred $7,500.00 to JKS Research LLC's account #6070 at Security Service Federal Credit Union.   On February 20, 2015, J.G. made two wire transfers of $8,750.00 to the JKS Research LLC account.   In total, J.G. transferred $25,000.00 to the JKS Research LLC account.

## THE CONTROLLED SUBSTANCES ACT

92.     In 1970, Congress consolidated more than 50 laws related to the control of legitimate channels of narcotics and dangerous drugs into one statute, the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. § 801–971), commonly referred to as the "Controlled Substances Act."

93.     The CSA and its subsequent revisions and additions, coupled with Title 21 of the Code of Federal Regulations (the implementing regulations for the CSA), form the basis for the DEA's authority to investigate criminal and civil violations committed by organizations and individuals involved in the growing, manufacturing, or distribution of controlled substances and listed chemicals. 21 C.F.R. § 1300 *et seq.*

94.     The CSA also gives the DEA the authority to administer and regulate the legitimate manufacture, prescribing, and dispensing of controlled substances and listed chemicals by providing for a "closed" system of drug distribution for legitimate handlers of such drugs, along

with criminal penalties for transactions outside the legitimate chain. H.R. REP. NO. 91-1444 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4566, 4571–4572.

95.     This closed system was created in an effort to deter, detect, and eliminate the diversion of controlled substances and listed chemicals into the illicit market while ensuring an adequate supply of controlled substances and listed chemicals is available for legitimate medical, scientific, research, and industrial purposes.

96.     The CSA mandates that any persons or entities who manufacture, distribute, dispense, import, export, or conduct research or chemical analysis with controlled substances and listed chemicals shall obtain an annual registration by the DEA. 21 U.S.C. § 822 (2016).

97.     The CSA states "[i]t shall be unlawful for any person who is subject to the requirements of Part C to distribute or dispense a controlled substance in violation of section 829 of this title." 21 U.S.C. § 842(a)(1) (2016).   Under 21 U.S.C. § 829(a),(b), "…no controlled substance in schedule II….may be dispensed without the written prescription of a practitioner..." and "….no controlled substance in Schedule III or IV, which is a prescription drug…may be dispensed without a written or oral prescription in conformity with section 503(b)…"

98.     In detailing the elements of a legitimate prescription, the CSA requires "[a]ll prescriptions for controlled substances shall be dated as of, and signed on, the day when issued and shall bear the full name and address of the patient, the drug name, strength, dosage form, quantity prescribed, directions for use, and the name, address, and registration number of the practitioner." 21 C.F.R. § 1306(5)(a).

99.     It is unlawful for any person who is a registrant under the CSA to distribute or dispense a controlled substance in violation of section 829 of the CSA.   A person who violates this provision is liable for a penalty of $25,000 per violation for violations occurring before August 1,

2016.  21 U.S.C. § 842(c)(1)(A).  For violations occurring between August 1, 2016 and February 3, 2017, the penalty is $62,500 per violation.  28 C.F.R. § 85.5, Federal Register Vol. 83, No. 19.

### DR. DE JESUS' CONDUCT

100.    In the course of issuing prescriptions at the DoubleTree Seminar on February 24, 2015, Dr. De Jesus issued 67 compounded prescriptions that contained a controlled substance as a component of the compounded drug.

101.    On November 15, 2016, investigating agents for the FBI executed a search warrant at Dr. De Jesus' facility located at 7959 Fredericksburg Road, Suite 135, San Antonio, Texas 78229.

102.    During the course of executing the search warrant at the facility, the FBI discovered the unsigned Consulting Services Agreement with Marlin Medical Solutions LLC, the TRICARE beneficiary information cards, blank pre-printed prescriptions for compounded drug products, and the completed prescriptions issued by Dr. De Jesus to TRICARE beneficiaries, including those example prescriptions identified above in Paragraphs 59 through 74.  The agents did not uncover any other medical records indicating that an office visit and examination supporting the medical necessity of the prescriptions found for any of the TRICARE beneficiaries.

103.    The FBI further discovered four otherwise blank controlled substances prescriptions bearing Dr. De Jesus' handwritten signature.  These prescriptions were taken into evidence.

### COUNT I
### False Claims Act: Presentement of False Claims
### 31 U.S.C. §§ 3729(a)(1) and (a)(1)(A))

104.    The United States repeats and realleges all preceding paragraphs of this Complaint as if fully set forth herein.

105.     As detailed above, Defendants Marlin Medical, Medscript Pharmacy, Rite Care Pharmacy, Rite Care Pharmacy IV, Edwards, Dr. Niemeyer, Dr. Rowe, and Dr. De Jesus presented or caused to be presented, materially false and fraudulent claims for payment or approval to the United States, including claims for reimbursement by TRICARE that were false and fraudulent because, among other things, they (i) were the direct result of kickback incentive payments between Defendants Edwards, Medscript Pharmacy, Rite Care Pharmacy and Rite Care Pharmacy IV within the meaning of 42 U.S.C. § 1320a-7b, and 32 C.F.R. §199.9(c)(4) and therefore tainted; (ii) were the direct result of kickback incentive payments between Defendants Edwards, Dr. Niemeyer, Dr. Rowe, and Dr. De Jesus within the meaning of 42 U.S.C. § 1320a-7(b), and 32 C.F.R. §199.9(c)(4) and therefore tainted; and (iii) were the direct result of kickbacks paid to the TRICARE beneficiary via payments made by S.E., K.B., and J.G. using funds provided by Defendant Edwards within the meaning of 42 U.S.C. § 1320a-7b, and 32 C.F.R. §199.9(c)(4) and therefore tainted..

106.     TRICARE, unaware of the falsity of the claims, paid for claims that would otherwise not have been allowed.

107.     Defendants presented or caused to be presented these claims with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether they were false.

108.     Defendants are liable to the United States for damages in an amount to be determined at trial, but not less than $2,613,777.46 in single damages, trebled, as well as a minimum civil penalty to the United States of $5,500 and up to a maximum penalty of $11,000 for each false claim presented or caused to be presented between February 24, 2015 and May 1, 2015.

**COUNT II**
**False Claims Act: Using False Statements to Get False Claims Paid**
**(31 U.S.C. § 3729(a)(1)(B))**

109. The United States repeats and realleges all preceding paragraphs of this Complaint as if fully set forth herein.

110. As detailed above, Defendants Marlin Medical, Medscript Pharmacy, Defendant Rite Care Pharmacy, Rite Care Pharmacy IV, Edwards, Dr. Niemeyer, Dr. Rowe, and Dr. De Jesus presented or caused to be presented, materially false and fraudulent claims for payment or approval to the United States, including claims for reimbursement by TRICARE that were false and fraudulent because, among other things, they (i) were the direct result of kickback incentive payments between Defendants Edwards, Medscript Pharmacy, Rite Care Pharmacy and Rite Care Pharmacy IV within the meaning of 42 U.S.C. § 1320a-7b, and 32 C.F.R. §199.9(c)(4) and therefore tainted; (ii) were the direct result of kickback incentive payments between Defendants Edwards, Dr. Niemeyer, Dr. Rowe, and Dr. De Jesus within the meaning of 42 U.S.C. § 1320a-7(b), and 32 C.F.R. §199.9(c)(4) and therefore tainted; and (iii) were the direct result of kickbacks paid to the TRICARE beneficiary via payments made by S.E., K.B., and J.G. using funds provided by Defendant Edwards within the meaning of 42 U.S.C. § 1320a-7b, and 32 C.F.R. §199.9(c)(4) and therefore tainted.

111. Defendants' false certifications and representations were made for the purpose of ensuring the TRICARE Program paid the false or fraudulent claims, which was a reasonable and foreseeable consequence of Defendants' statements and actions.

112. The false certifications and representations made or caused to be made by Defendants were material to the payment of the false claims by the United States. TRICARE, unaware of the falsity of the claims, paid for claims that would otherwise not have been allowed.

113. Said false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether they were false.

114.   Defendants are liable to the United States for damages in an amount to be determined at trial, but not less than $2,613,777.46 in single damages, trebled, as well as a minimum civil penalty to the United States of $5,500 and up to a maximum penalty of $11,000 for each false claim presented or caused to be presented between February 24, 2015 and May 1, 2015.

**COUNT III**
**Anti-Kickback Statute: False Claims Resulting from a Kickback Violation**
**(42 U.S.C. § 1320a-7b(g))**

115.   The United States repeats and realleges all preceding paragraphs of this Complaint as if fully set forth herein.

116.   As described above, Defendants Marlin Medical, Medscript Pharmacy, Rite Care Pharmacy, Rite Care Pharmacy IV, Edwards, Dr. Niemeyer, Dr. Rowe, and Dr. De Jesus engaged in a kickback scheme resulting in the submission of false claims for payment to the TRICARE program. Defendant Edwards paid Defendants Drs. Niemeyer, De Jesus, and Rowe to induce them to issue compounded prescriptions regardless of medical necessity of the prescriptions.  Defendant Edwards further paid TRICARE beneficiaries to incentivize their attendance at the seminars where Defendants Drs. Niemeyer, De Jesus, and Rowe issued these prescriptions.  Defendant Edwards in turn was paid by Defendants Medscript Pharmacy, Rite Care Pharmacy, and Rite Care Pharmacy IV an amount calculated as a percentage of TRICARE reimbursements received for these prescriptions.

117.   These payments constitute kickbacks within the meaning of 42 U.S.C. § 1320a-7b(a)-(b), and therefore taint the prescriptions submitted to TRICARE for reimbursement as false or fraudulent under 42 U.S.C. § 1320a-7b(g).

**COUNT IV**
**False Claims Act: Conspiracy to Submit False Claims**
**(31 U.S.C. § 3729(a)(1)(C))**

118.    The United States repeats and realleges all preceding paragraphs of this Complaint as if fully set forth herein.

119.    As described above, Defendants Marlin Medical, Medscript Pharmacy, Rite Care Pharmacy, Rite Care Pharmacy IV, Edwards, Dr. Niemeyer, Dr. Rowe, and Dr. De Jesus conspired to exchange kickbacks in order to obtain compound drug prescriptions, send the prescriptions for fulfillment, and submit claims for reimbursement to TRICARE.

120.    Defendants Marlin Medical and Edwards conspired with Medscript Pharmacy, Rite Care Pharmacy, and Rite Care Pharmacy IV to obtain compound drug prescriptions for fulfillment by these pharmacies and submission for reimbursement to TRICARE in exchange for financial compensation.

121.    As described above, Defendant Edwards conspired with Drs. Niemeyer, Rowe, and De Jesus to prepare prescription request forms for compound drug products in exchange for financial compensation, regardless of the medical necessity of such prescriptions.

122.    As a direct result of the conduct of the conspiracies, false and fraudulent claims for prescription compounded drug products were submitted to TRICARE for reimbursement.

123.    Defendants are liable to the United States for damages in an amount to be determined at trial, but not less than $2,613,777.46 in single damages, trebled, as well as a minimum civil penalty to the United States of $5,500 and up to a maximum penalty of $11,000 for each false claim presented or caused to be presented between February 21, 2015 and May 1, 2015.

### COUNTS V-VIII
**Controlled Substances Act: Pre-Signed Blank Prescriptions for Controlled Substances**
**21 U.S.C. §§ 829(a), 842(a)(1), and 21 C.F.R. §1306(5)(a)**

124.    The United States repeats and realleges all preceding paragraphs of this Complaint as if fully set forth herein.

125.     Defendant Dr. De Jesus' handwritten signature on four otherwise blank prescriptions for controlled substances as discovered on November 15, 2016, constitutes eight separate violations of 21 U.S.C. §§ 829(a), 842(a)(1), and 21 C.F.R. §1306(5)(a).

126.     Defendant Dr. De Jesus is subject to a penalty of up to $62,500 per violation. 28 CFR §85.5, Fed. Reg. Vol. 83, No. 19.

## PRAYER FOR RELIEF

Wherefore, the United States demand that judgment be entered in their favor and against Defendants jointly and severally as follows:

1)     On Counts One, Two, Three, and Four against all Defendants for violation of the FCA with the amount of damages trebled and such penalties as required by law, together with all such further relief as may be just and proper.

2)     On Counts, Five, Six, Seven, and Eight against Defendant Dr. De Jesus for violation of the CSA in the amount of not more than $62,500.00 per violation.

3)     All other relief as may be required or authorized by law and in the interests of justice.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the United States demands a

trial by jury on all issues so triable.

Respectfully submitted,

For the United States:

ASHLEY C. HOFF
United States Attorney

By: _____
ERIN M. VAN DE WALLE
Assistant United States Attorney
Florida Bar No. 0099871
SAMUEL M. SHAPIRO
Assistant United States Attorney
District of Columbia. Bar No. 1614033
601 N.W. Loop 410, Suite 600
San Antonio, Texas 78216
Tel: (210) 384-7300
Erin.Van.De.Walle@usdoj.gov
Samuel.Shapiro@usdoj.gov

*Counsel for the United States*